**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| _____ | : | |
| NEW JERSEY ASSOCIATION OF | : | |
| SCHOOL ADMINISTRATORS, | : | |
| DR. TERRY VAN ZOEREN, | : | |
| DR. SIMON BOSCO, | : | |
| JOSEPH ABATE, JR., and | : | |
| JOHN GOLDEN, | : | |
|  | : | |
| Plaintiffs, | : | Civil Action No. 08-4086 (JAP) |
|  | : | |
| v. | : | **OPINION** |
|  | : | |
| LUCILLE E. DAVY, Commissioner of | : | |
| Education of the State of New Jersey, and | : | |
| ANNE MILGRAM, Attorney General of | : | |
| the State of New Jersey, | : | |
|  | : | |
| Defendants. | : | |
|  | : | |
| _____ | : | |

PISANO, District Judge.

Plaintiffs bring this action challenging the constitutionality of recently enacted regulations that set forth standards by which to review new employment contracts for New Jersey public school Superintendents, Assistant Superintendents and School Business Administrators. Specifically, Plaintiffs seek to enjoin and restrain the State Commissioner of Education ("Commissioner") from maintaining and enforcing the regulations set forth in *N.J.A.C.* 6A: 23A-1.1 *et seq.* and to invalidate any action taken by the Commissioner or an Executive County Superintendent ("ECS") pursuant to these regulations. Presently before the Court is Defendants' motion to dismiss the Verified

Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  The Court heard oral argument on September 10, 2008.  For the reasons set forth below, the Court denies the application for injunctive relief and abstains from decision based on the principles announced in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).  Accordingly, the Court grants the motion to dismiss.[1]  Furthermore, the Court declines to exercise supplemental jurisdiction over the state law claims asserted in Plaintiffs' Complaint.  *See* 28 U.S.C. § 1367(c)(3).

## I.    **Background**[2]

This case involves reform efforts intended to introduce fiscal transparency and accountability in education funding in an effort to alleviate New Jersey's property taxes.  Owing to public outcry over the terms of some contracts at issue here, the legislature granted the Commissioner the power to promulgate regulations that set forth standards for Superintendent, Assistant Superintendent and School Business Administrator contracts.  A factual history of the events leading up to the instant litigation is set forth below.

Tenure is the cornerstone of employment in New Jersey public education.  Under New Jersey law, once an educator achieves tenure status, he or she may not be discharged without notice and a hearing consistent with due process.  As such, public school educators enjoy a level of job security unknown to the private sector.

In 1991 the New Jersey Legislature eliminated lifetime tenure for public school Superintendents.  *N.J.S.A.* 18A:17-20, 18A:17-24.   Ironically, this was part of a reform effort

---

[1]When a federal court abstains under *Burford* the proper procedure is to dismiss the case entirely. *Burford*, 319 U.S. at 334.  *See* Erwin Chemerinsky, Federal Jurisdiction, 755, 760 (3d ed. 1999).

[2]The facts recited in this opinion are taken from the pleadings unless otherwise indicated and do not represent the Court's factual findings.

designed to make school systems more accountable for their spending policies. *New Jersey Acts to End School Chiefs' Tenure*, N.Y. Times, July 26, 1991. This reform effort arose in the aftermath of controversy caused by the State buy-outs of six-figure contracts of some Superintendents. *Id.*

In place of tenure, Superintendents were given the right to enter into employment contracts for between three and five year terms. *N.J.S.A.* 18A:17-15. A Superintendent's contract is automatically renewed unless the Superintendent is notified of termination one year prior to the contract's expiration. *Id.* Effectively, this granted Superintendents "tenure during the term of the contract ... and [a Superintendent] shall not be dismissed or reduced in compensation except for inefficiency, incapacity, unbecoming conduct, or other just cause." *Id.* Under Title 18, however, Assistant Superintendents and School Business Administrators are still eligible for tenure. *N.J.S.A.* 18A:28-5; *N.J.S.A.* 18A:17-2. Their contract terms may not be changed during the duration of their current employment.

Unfortunately, what was touted as a major reform effort backfired because Superintendents essentially became "free agents" who were able to move from one school district to another and negotiate compensation packages layered with perquisites. These contracts were negotiated by local school boards with no advance public notice of their terms, no regulatory system in place to review them, and no definition of what constituted "compensation" under the contracts. As a result, some Superintendents were able to negotiate the following perquisites: payments at retirement or departure for years of unused, accumulated sick and vacation days; payments made on account of FICA or disability insurance; and payments to their estates for benefits accrued upon death.

In 2006 the legislature began another major legislative reform initiative. In an effort to encourage property tax reform, the Assembly Concurrent Resolution ("ACR") was adopted. The

3

ACR provides:

> WHEREAS, This State's high property taxes are a matter of great concern to the people of New Jersey who view the current system as regressive, inequitable, burdensome, and a threat to the financial security of individuals and communities; and
>
> WHEREAS, There is a need for the Legislature to address this situation by devising, and acting upon, means to bring about property tax reform based upon a fairer distribution of tax burdens and the adoption of efficiencies; and
>
> WHEREAS, This process should be initiated by the creation of joint legislative committees that review and formulate proposals concerning school funding, government consolidation and shared services, public employee benefits, and constitutional reform and property tax constitutional convention ...

*See* www.njleg.state.nj.us/2006/Bills/ACR/3_11.PDF (site last visited Nov. 12, 2008).

The ACR established several Joint Committees, which were tasked with reviewing and assessing current spending practices in New Jersey public schools. The Joint Committees made numerous findings after receiving reports and recommendations from various experts. These findings ultimately led to fiscal accountability and efficiency legislation, as well as a new school funding formula. Of notable importance were the findings of the Joint Legislative Committee on Government Consolidation and Shared Services ("JCGC"). *See* www.state.nj.us/PropertyTaxSession/jcgo.asp (site last visited Nov. 12, 2008) ("JCGC Report"). The JCGC Report was informed by a 2006 State Commission of Investigation ("SCI") report titled *Taxpayers Beware, What You Don't Know Can Cost You; An Inquiry Into Questionable and Hidden Compensation for Public School Administrators*. *See* www.state.nj.us/sci/reportsall.shtm (site last visited Nov. 12, 2008) ("SCI Report"). The SCI determined that there were "significant gaps in oversight and accountability at the local and state levels of government with regard to ensuring the propriety and reasonableness of compensation and benefits for public school administrators." SCI

4

Report at 10.  An analysis of salary data from 1997-2004 revealed that "average ... salaries paid to administrators as a group, including superintendents, assistant superintendents and business administrators, rose by 31 percent - more than twice the growth rate of average teacher salaries, which increased 14 percent during the same interval."  SCI Report at 2.  The SCI found this particularly troubling because taxpayers were unaware of the full costs of "employment packages approved by boards of education for school administrators" even though the taxpayers bear the burden of financing these packages.  *Id.*  Accordingly, the SCI urged the Legislature to provide a mechanism that would ensure that taxpayers were informed of the manner in which their tax dollars were spent.  *Id.* at 10.

As a result of the findings in the SCI report, the JCGC made numerous recommendations aimed at combating the excessive spending and promoting transparency.  JCGC Report at 1, 2, 55. Of particular relevance to the instant case is recommendation number 7 which "expands [the] powers of 21 'Executive County' superintendents to oversee local district administrative spending."  *Id.* at 3.  The JCGC proposed revamping the role of the ECS to give them "broad authority to eliminate administrative waste and overhead, including direct authority over approval of local school budgets" .... "without disrupting the quality of education."  *Id.* at 56.  To facilitate this mandate, the JCGC recommended granting the ECS the power to "approve or disapprove the .... compensation[] and benefit plans of local school superintendents."  *Id.*

Additionally, the Joint Committee for Public Employee Benefits Reform ("JCBR") made several recommendations aimed at reducing excesses in supplemental compensation paid to other public employees, including Assistant Superintendents and School Business Administrators.  The JCBR was informed by the SCI report and found that weaknesses in the current regulatory structure

enabled local school district employees "to obtain lucrative packages involving sick and vacation leave." *See* www.state.nj.us/PropertyTaxSession/jcpe.asp, at 142 (site last visited Nov. 17, 2008) ("JCBR Report").   As such, the JCBR proposed to enact "legislation to limit sick leave compensation payable upon retirement to $15,000 for local government and public employees." *Id.* at 142.   Additionally, the JCBR found that school administrators were able  "to cash in substantial amounts of accumulated sick and vacation leave upon retirement or departure," because there was no limit to the amount of vacation time that school district employees were able to accumulate.  *Id.* at 144.   The JCBR, therefore, recommended enacting legislation to limit the accumulation of vacation leave to one year in an effort to enable local districts to control school spending and effectively reduce property taxes.  *Id.*

Several bills were enacted based on the reports and recommendations of the Joint Committees.  The first bill enacted requires notice and a hearing on proposed contract changes for Superintendents, Assistant Superintendents and School Business Administrators, and places restrictions on travel expenditures for school board employees and members.  *N.J.S.A.* 18A:11-11; *N.J.S.A.* 18A:11-12.  The second bill establishes the position of the ECS and instructs them "to review and approve, according to standards adopted by the commissioner, all employment contracts for superintendents of schools, assistant superintendents of schools, and school business administrators ... prior to the execution of those contracts." *N.J.S.A.* 18A:7-1 *et seq.*; *N.J.S.A.* 18A:7-8.  Finally, a third bill places a $15,000 limit on the payment of supplemental compensation for accumulated unused sick leave and limits accumulated vacation time for an officer or employee to one year.  *N.J.S.A.* 18A:30-5; *N.J.S.A.* 18A:30-9.

Subsequently, the School Funding Reform Act of 2008 ("SFRA"), *N.J.S.A.* 18A:7F-43 *et*

6

*seq.*, was passed on January 12, 2008.  The SFRA created a new school funding formula designed to work "in conjunction with the various school accountability measures that had been enacted in recent years to promote greater oversight, transparency, and efficiency in educational services." *N.J.S.A.* 18A:7F-44(o).  The legislation specifically references several of the fiscal accountability recommendations highlighted by the Joint Committees' reports, including revamping the ECS position.  *N.J.S.A.* 18A:7F-44(o).  Pursuant to the SFRA, the Commissioner may withhold approval for education expenditures unrelated to student achievement and  "[t]he [C]ommissioner shall be authorized to take any affirmative action as is necessary to ensure the effective and efficient expenditure of school funds."  *N.J.S.A.* 18A:7F-60.

Using the authority vested in her by the SFRA and the fiscal accountability measures, the Commissioner promulgated the regulations at issue in this case.  The regulations, codified at *N.J.A.C* 6A:23A-1.1 *et seq.*, became effective on July 1, 2008.  The purpose of the regulations

> is to assure the financial accountability of boards of education through enhanced State monitoring, oversight and authority, and to ensure that each district board of education adopts an annual budget that provides adequate resources to meet the State Constitution's mandate for a thorough and efficient system of free public schools for all children.

*N.J.A.C.* 6A:23A-1.1.

Pursuant to the regulations, the Commissioner delegated her duties to the ECS to review and approve new employment contracts for Superintendents, Assistant Superintendents and School Business Administrators.  *N.J.A.C.* 6A:23A-3.1.  As part of the review process, the ECS must determine whether the contract is comparable with "salary, benefits and other emoluments contained in the contracts of similarly credentialed and experienced administrators in other districts in the

region with similar enrollment, academic achievement levels and challenges, and grade span."

*N.J.A.C.* 6A:23A-3.1(e)(1). The regulations provide for an appeal to the Commissioner of any action

taken by the ECS regarding a contract. *N.J.A.C.* 6A:23A-3.1(f). In addition to the appeals process

set forth in the regulations, any party can appeal an adverse decision of any state agency or officer

as a matter of right to the Appellate Division of the Superior Court. *N. J. Ct. R.* 2:2-3(a)(2). In the

instant case, the Plaintiffs challenge the following standards used by the ECS in reviewing contracts

of Superintendents, Assistant Superintendents and School Business Administrators:

> *N.J.A.C.* 6A:23A 3.1 (e)(1) Contracts for each class of administrative position shall be comparable with the salary, benefits and other emoluments contained in the contracts of similarly credentialed and experienced administrators in other districts in the region with similar enrollment, academic achievement levels and challenges, and grade span.

> *N.J.A.C.* 6A:23A 3.1(e)(3) No contract shall include provisions for the reimbursement or payment of employee contributions that are either required by law or by a contract in effect in the district with other teaching staff members, such as payment of the employee's State or Federal taxes, or of the employee's contributions to FICA, Medicare, State pensions and annuities (TPAF), life insurance, disability insurance (if offered), and health benefit costs.

> *N.J.A.C.* 6A:23A 3.1(e)(4) No contract shall contain a payment as a condition of separation from service that is deemed by the [ECS] to be prohibited or excessive in nature. The payment cannot exceed the lesser of the calculation of three months pay for every year remaining on the contract with proration for partial years, not to exceed 12 months, or the remaining salary amount due under the contract.

> *N.J.A.C.* 6A:23A 3.1(e)(5) No contract shall include benefits that supplement or duplicate benefits that are otherwise available to the employee by operation of law, existing group plan, or other means; for example, an annuity or life insurance plan that supplements or duplicates a plan already made available to the employee. Notwithstanding the provisions of this section, a contract may contain an annuity where those benefits are already contained in the existing contract between the employee and the district.

8

*N.J.A.C.* 6A:23A 3.1(e)(6) Contractual provisions regarding accumulation of sick leave and supplemental compensation for accumulated sick leave shall be consistent with *N.J.S.A.* 18A:30-3.5. Supplemental payment for accumulated sick leave shall be payable only at the time of retirement and shall not be paid to the individual's estate or beneficiaries in the event of the individual's death prior to retirement. Pursuant to *N.J.S.A.* 18A:30-3.2, a new board of education contract may include credit of unused sick leave days in accordance with the new board of education's policy on sick leave credit for all employees.

*N.J.A.C.* 6A:23A 3.1(e)(7) Contractual provisions regarding accumulation of unused vacation leave and supplemental compensation for accumulated unused vacation leave shall be consistent with *N.J.S.A.* 18A:30-9. Contractual provisions for payments of accumulated vacation leave prior to separation can be included but only for leave accumulated prior to June 8, 2007 and remaining unused at the time of payment. Supplemental payments for unused vacation leave accrued consistent with the provisions of *N.J.S.A.* 18A:30-9 after June 2007 as well as unused vacation leave accumulated prior to June 8, 2007 that has been paid, shall be payable at the time of separation and may be paid to the individual's estate or beneficiaries in the event of the individual's death prior to separation.[3]

*N.J.A.C.* 6A:23A 3.1(e)(8) Contractual provisions that include a calculation of per diem for 12-month employees shall be based on a 260-day work year.

*N.J.A.C.* 6A:23A 3.1(e)(9) No provision for a bonus shall be made except where payment is contingent upon achievement of measurable specific performance objectives expressly contained in a contract approved pursuant to this section, where compensation is deemed reasonable relative to the established performance objectives and achievement of the performance objectives has been demonstrated to the satisfaction of the district board of education.

*N.J.A.C.* 6A:23A 3.1(e)(11) No contract shall include a provision for monthly allowance except for a reasonable car allowance. A reasonable car allowance cannot exceed the monthly cost of the average monthly miles traveled for business purposes multiplied by the allowable mileage reimbursement pursuant to applicable law and regulation and the New Jersey Office of Management and Budget (NJOMB) circulars. If such allowance is included, the employee cannot be reimbursed for

---

[3]Plaintiffs do not explicitly challenge this regulation in their Complaint. However, they ask the Court to find that *N.J.S.A.* 18A:30-9, the statute underlying this regulation, does not apply to Superintendents, Assistant Superintendents or School Business Administrators. Therefore, the Court construes this as a challenge to this regulation.

business travel mileage nor assigned permanently a car for official district business. Any provision of a car for official district business must conform with *N.J.A.C.* 6A:23A-6.12 and be supported by detailed justification.  No contract can include a provision of a dedicated driver or chauffeur.

Although Plaintiffs have not presented the Court with any specific contract that has been adversely affected by the new regulations, they claim that the regulations violate their rights under the United States Constitution.  Specifically they argue, *inter alia*, that the regulations: (1) violate their Due Process rights because the regulations infringe on existing property rights and property rights to which they have a reasonable expectation of maintaining; (2) violate the Due Process Clause because they are void for vagueness; and (3) violate their Equal Protection rights because their contracts will be compared to other administrators in their region who might not be similarly situated.  Compl. ¶¶ 26-29, 34-37, 41-47.  Plaintiffs also assert several state law claims including violations of the state tenure laws, violations of provisions of the administrative code, and interference with the lawyer-client relationship. Compl. ¶¶ 28, 53-55, 57-64. Additionally, Plaintiffs urge the Court to find that the statutes underlying the regulations in *N.J.A.C.* 6A:23A-3.1(e)(6) and *N.J.A.C.* 6A:23A-3.1(e)(7), limiting accumulated sick and vacation days, "do not by their plain language apply to Superintendents, Assistant Superintendents, or Business Administrators and that the [n]ew [r]egulations upon them cannot stand."  Pl.'s Ltr. Br. Nov. 3, 2008 at 2.

## II.     Legal Discussion

The crux of the dispute has become how to define "compensation" in contracts to be negotiated in the future.  During oral argument the Court instructed the parties to negotiate toward reaching an agreement regarding disputed terms and definitions in the regulations.   After several unsuccessful attempts at reaching an agreement, the Court now denies the request to enjoin the use

10

of the regulations to review future contracts and contracts being currently negotiated.  Furthermore, the Court abstains from deciding the merits of the remaining claims.

A.    Injunctive Relief

In evaluating a motion for preliminary injunctive relief, a court must consider whether: "'(1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest.'" *NutraSweet Co. v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (quoting *Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998)). A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Masurek v. Armstrong*, 520 U.S. 968, 972 (1997).  Preliminary injunctive relief is, therefore, an "extraordinary and drastic remedy," *Id.*, which "should issue only if the [movant] produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994).

i.    *Likelihood of Success on the Merits*

During oral argument, Plaintiffs and Defendants agreed that the new regulations must be interpreted and applied so as not to impair any rights now enjoyed by Assistant Superintendents and School Business Administrators under the state tenure laws, or any existing contractual terms of Superintendents. *See* Order Reserving Judgment, Sept. 22, 2008.  Thus, the regulations will apply prospectively and have no application to current contracts or to the tenure of any administrator now serving under an employment contract.  Although Plaintiffs have raised a due process claim in

11

respect of new, or yet-to-be negotiated, contracts, anticipated employment terms are not protected

by due process because there would be no "taking" of a recognized "property interest". *Bd. of*

*Regents v. Roth*, 408 U.S. 564, 577 (1972) ("To have a property interest in a benefit, a person clearly

must have more than an abstract need or desire for it.   He must have more than a unilateral

expectation of it.   He must, instead, have a legitimate claim of entitlement to it."); *see also*

*Harrington v. Lauer,* 888 F. Supp. 616, 619 (D.N.J. 1995) (finding that a Superintendent only has

a property interest in compensation due under an existing contract).  Consequently, the Court finds

that Plaintiffs have failed to demonstrate a likelihood of success on the merits of their due process

claim.

ii      *Plaintiffs Cannot Demonstrate Immediate, Irreparable Harm*

In order "to show irreparable harm a plaintiff must 'demonstrate potential harm which cannot

be redressed by a legal or equitable remedy.'" *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d

Cir. 1994).   "The requisite for injunctive relief has been characterized as a 'clear showing of

immediate irreparable injury,' or a 'presently existing actual threat; [an injunction] may not be used

simply to eliminate a possibility of a remote future injury." *Id.* at 655 (internal citations omitted).

As noted above, all existing contracts are protected by statute.  Moreover, any decision of an ECS

who rejects a proposed contract is subject to appeal. *N.J.A.C.* 6A:23A-3.1(f); *N.J. Ct. R.* 2:2-3(a)(2).

The Court finds that Plaintiffs have failed to demonstrate the existence of a harm that could not be

redressed with legal or equitable relief in order to justify a preliminary injunction.

iii.     *The Balance of Relative Harms Weighs Against Injunctive Relief*

The third factor in the preliminary injunction analysis requires a court to consider whether

12

the opposing party will be harmed if an injunction is granted.  *Atlantic City Coin & Slot Serv. Co., Inc. v. IGT*, 14 F. Supp. 2d 644, 657 (D.N.J. 1998); *see also Neo Gen Screening, Inc. v. TeleChem. Int'l., Inc.*, 69 Fed. Appx. 550, 554 (3d Cir. 2003).  Injunctive relief would have a dramatic, negative effect on the State.  Any further delay in reviewing new contracts according to the regulations would interfere with the State's legitimate legislative goal of property tax and public school funding reform.  The Court finds that the balance of the harms favors denying injunctive relief.

> iv.    There is a Substantial Public Interest

The final equitable factor a court must consider is "the public interest in the grant or denial of the requested relief, if relevant."  *Atlantic City Coin*, 14 F. Supp. 2d at 657.  The Court finds that the regulations are intended to achieve a perfectly legitimate state interest–accountability and transparency in public school administration.  Plaintiffs' argument that their total income will somehow be reduced unless the injunction is entered (which may not occur) is outweighed by the public interest.

Accordingly,  the application for a preliminary injunction is denied.  The Court now turns to the State's motion to dismiss.

B.    <u>Abstention</u>

It is well settled that abstention from the exercise of federal jurisdiction is the exception and not the rule.  *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976).  "The doctrine of abstention, under which a [d]istrict [c]ourt may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a [d]istrict [c]ourt to adjudicate a controversy properly before it.  Abdication of the obligation to decide cases can be

13

justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Id*. (quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188-89 (1959)).  It is appropriate for the Court to abstain in those cases which present a "federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law." *Id*. at 189 (internal citations omitted).

Abstention is also appropriate in those instances when difficult questions of state law bear on problems of "substantial public import whose importance transcends the result in the case then at bar." *Id*. (citing *La. Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959)).  However, the state law question does not need to be determinative of state policy.  All that is required is that federal review of the question would be disruptive of state efforts to establish a coherent policy with respect to a matter of significant public concern.  *Colo. River*, 424 U.S. at 814.  To that end, a district court should resolve a federal constitutional claim when it is compelled to do so, and not when its federal adjudication may be transitory and subject to displacement by the action of a state court.  *See O'Neill v. City of Philadelphia*, 32 F.3d 785, 792 (3d Cir. 1994).

In *Burford v. Sun Oil Co.*, the United States Supreme Court held that a federal court should abstain from exercising its jurisdiction in order to give a state court the opportunity to determine important questions of state law which may prevent the need to address a constitutional issue. *Chiropractic Am. v. Lavecchia*, 180 F.3d 99, 104 (3d Cir. 1999) (citing *Burford*, 319 U.S. at 333 n. 29)).   This doctrine, known as *Burford* abstention provides:

> Where timely and adequate state court review is available, a federal court sitting in equity must decline to interfere with the proceedings

> or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (quoting *Colo. River Water Conservation Dist.*, 424 U.S. at 814). *Burford* abstention restricts "interference by the federal courts in determinations of inherently local matters made by state courts pursuant to a complex state regulatory scheme." *Motor Club of Am. v. Weatherford*, 841 F. Supp. 610, 623 (D.N.J. 1994) (citing *Univ. of Md. v. Peat Marwick Main & Co.*, 923 F.2d 265, 270 (3d Cir. 1991)).

### i.    Timely and Adequate State Court Review is Available

The first step in the *Burford* abstention analysis is whether "timely and adequate state-court review" is available. *Chiropractic Am.*, 180 F.3d at 104 (citing *Riley v. Simmons*, 45 F.3d 764, 771 (3d Cir. 1995)). "Only if a district court determines that such review is available, should it turn to the other [abstention factors]." *Id.*

The regulations provide that any action taken by the ECS regarding a contract may be appealed to the Commissioner. *N.J.A.C.* 6A:23A-3.1(f). If an appeal is filed, the Commissioner may address the issue or alternatively may submit the matter to the Office of Administrative Law ("OAL"). *N.J.A.C.* 6A:3-1.11. Any party dissatisfied with the Commissioner's or OAL's determination may appeal as a matter of right to the Appellate Division of the Superior Court. *N.J. Ct. R.* 2:2-3(a)(2).

The scope of appellate review under Rule 2:2-3(a)(2) generally encompasses three areas: "(1)

whether the agency's action violates the express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency bases its action; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors." *Chiropractic Am. v. Lavecchia*, 1999 WL 61429, \*6 (D.N.J. Feb. 8, 1999), *aff'd* 180 F.3d 99 (3d Cir. 1999) (citing *Matter of Musick*, 143 N.J. 206, 216 (1996); *Campbell v. Dept. of Civil Serv.*, 39 N.J. 556, 562 (1963)).  Further, under Rule 2:9-2, the usual briefing and oral argument schedule "may be accelerated on the court's own motion or on the motion of any party," and under Rule 2:9-7, "[o]n or after the filing with the Appellate Division of a notice of appeal ... from a state administrative agency or officer, a motion for interim relief or for a stay of the decision, action or rule under review shall be made in the first instance to the agency whose order is appealed from and, if denied, to the Appellate Division."  *Chiropractic Am.*, 1999 WL 61429 at \*6. Additionally, pursuant to Rule 2:5-5(b), the Appellate Division of the New Jersey Superior Court may permit supplementation of the record on appeal, including the ability to present live witnesses before a designated superior court judge.  As such, the Court finds that timely and adequate state court review is available to any party who wishes to appeal the action of an ECS, and the first abstention factor is therefore satisfied.

    ii.  *Abstention Under Both Burford Prongs is Proper*

  In *New Orleans Public Service*, the United States Supreme Court developed a three-factor test to employ when analyzing the second prong of *Burford* abstention.  Under this test, a court must determine: (1) "whether the particular regulatory scheme involves a matter of substantial public concern; (2) 'whether it is 'the sort of complex, technical regulatory scheme to which the *Burford*

abstention doctrine is usually applied,' *Felmeister v. Office of Attorney Ethics*, 856 F.2d 529, 534 (3d Cir. 1988); and (3) whether federal review of a party's claims would interfere with the state's efforts to establish and maintain a coherent regulatory policy." *Chiropractic Am.*, 180 F.3d at 105 (citing *New Orleans Pub. Serv.*, 491 U.S. at 361)).

*Chiropractic America* involved regulations aimed at reducing the cost of automobile insurance in New Jersey. *Id.*  The administration of public education is certainly of no less importance than controlling the cost of automobile insurance.  Therefore, the Court concludes that the regulatory scheme  involves a matter of substantial public concern which transcends any dispute as to a particular administrator's future contract terms.

In *Washington Township v. Davy*, the court found that the "legislature and State Board's current approach to education funding is the 'sort of complex technical regulatory scheme to which the *Burford* abstention doctrine is usually applied.'" 2007 U.S. Dist. LEXIS 75327 at *23 (D.N.J. Oct. 10, 2007).  Here, the ECS is tasked with reviewing proposed contracts to ensure that they are drafted in accordance with the underlying goal of promoting fiscal accountability in school funding. Specifically, the interpretation of "compensation"  must be conducted in light of the lengthy history of the entire legislative reform package, the state tenure laws, and existing contractual rights. Interpreting "compensation" is further complicated by the organization and structure of Title 18, which transforms this task into a highly technical (and frustrating) exercise.  Furthermore, the parties have failed to agree on an acceptable definition of compensation.[4]  Whether perquisites are included in "compensation" should be resolved according to the State's regulatory framework, leaving

---

[4]Although the State seeks to define aspects of compensation according to *N.J.S.A.* 18A:30-3.5 and *N.J.S.A.* 18A:30-3.9, the Court finds that these statutes are not, by their plain language, applicable to Superintendents, Assistant Superintendents and School Business Administrators.

resolution of disputes to the state administrative process, not to a federal court.

Finally, federal review of this case would interfere with the State's efforts to establish and maintain a coherent regulatory policy, requiring "an in-depth analysis of the legislative purposes [of the regulations], a major reform effort in an area of law ... that has been typically left to the states to regulate." *Chiropractic Am.*, 180 F.3d at 107 (internal citations omitted).   For this reason, the Court finds that Plaintiffs' concerns raised in their void for vagueness claim should be first addressed by the Commissioner through the administrative process.

## III.    Conclusion

For the reasons stated above, the Court denies the application for injunctive relief and abstains from decision on the merits of the case.   Accordingly, the Court grants the motion to dismiss under *Burford* abstention.   An appropriate order follows.

18